JACK AND JILL, INC. v. JOSEPH M. TONE.

MALTBIE, C. J., HINMAN, AVERY, BROWN and JENNINGS, JS.

 

Argued October 11—decided November 16, 1939.

*Nathan R. Bassett*, with whom, on the brief, were *M. M. Merriam* and *Harry Sohcot*, for the appellant (plaintiff).

*Harry Silverstone*, assistant attorney general, with whom, on the brief, was *Francis A. Pallotti*, attorney general, for the appellee (defendant).

AVERY, J. This is an appeal from the action of the commissioner of labor and factory inspection, and ex officio administrator of unemployment compensation, pursuant to the authority contained in General Statutes, 1937 Sup., § 814d (f), in assessing an additional amount of contributions as due from the plaintiff. The amount or method of computation of the assessment is not in dispute. The sole question raised is whether the persons, upon whose account the assessment was predicated, were employees of the plaintiff or independent contractors. From the finding, with such corrections as the plaintiff is entitled to, the facts

material to the determination of the question involved on this appeal may be summarized as follows: The plaintiff corporation is engaged in the business of purchasing large quantities of ice cream at wholesale, making it into pint packages and various novelties and selling it later at retail to the general public. For these purposes, it operated a plant at New Haven with various employees engaged in its operation and the preparation of the products. Among these employees were three salesmen, who were paid regular salaries and performed various duties at the plant as well as selling the products. In addition, the plaintiff owned and maintained twenty-eight light automobile delivery trucks, each equipped with a refrigerator chest and painted white with the words "Jack & Jill Ice Cream," lettered conspicuously in red thereon. These trucks were operated upon established routes by drivers, twenty-eight young men. The question at issue is whether these drivers were employees of the plaintiff or independent contractors within the purview of the Unemployment Compensation Law, General Statutes, 1937 Sup., Chapter 280a. Each of these young men, before he was permitted to drive a truck, entered into a contract with the plaintiff in which he was referred to as a "purchaser." By the terms of the contract, the company agreed to loan to the "purchaser" one of the motor trucks and to sell to him, on consignment at certain stipulated prices, less than the fixed retail sales prices, all of the ice cream and products thereof required by him in the ice cream business to be conducted by him under the agreement, to accept without charge to the "purchaser" at the end of the business day all goods so furnished, which were returned, unsold, in good condition, and to loan to the "purchaser" one route to be returned at the termination of the relationship.

The "purchaser" agreed to purchase at stipulated prices, less than the retail sales prices, all of the ice cream, etc., required in the business to be conducted by him; to sell exclusively only products supplied by the plaintiff and have no others in his possession on the motor truck; to supply, at his own expense, all motor oil and gasoline required for the operation of the motor truck; to be liable for all repairs thereto and all injuries to the person or property of others caused by it while in his possession, the plaintiff, however, being irrevocably authorized to settle any claim against it from any such person. The "purchaser" agreed to pay the plaintiff at the end of each business day for the merchandise sold or not returned, unsold, during that day. The "purchaser" further agreed to deliver up the truck to the plaintiff at any time or place upon demand; to return to the plaintiff the list of customers furnished at the termination of the relationship; and thereafter to refrain from engaging in the business, directly or indirectly, in the county for a period of two years, and to furnish the plaintiff a cash security for the faithful performance of the agreement.

In practice, the drivers were required to wear a distinctive uniform, furnished and laundered by the plaintiff; were required to stay on their routes until 11 o'clock on warm nights; to report daily before going on their routes, although there was no fixed time for reporting, and, in practice, they reported between 9 and 11 a. m. Each driver was required to inform the manager or his assistants at what points he could be found at one-half hourly intervals. The assistant managers drove about from time to time to observe the manner in which the drivers covered their respective routes and whether they were at their appointed places at the approximate times fixed, also to

observe the appearance of the drivers with respect to wearing the uniforms and personal cleanliness, together with their conduct generally. On occasions, the assistant managers exercised the right to dismiss drivers who failed to conform to the direction given. Each driver was furnished with a retail price list and required to sell the merchandise at such prices. With the consent of the plaintiff, the drivers arranged a schedule in accordance with which each of them had one day per week off, on which day his truck was driven by another driver of the same class. If a driver wished to take an additional day off, he was required to make arrangements with the plaintiff and was not permitted in any case to provide his own substitute. On any day in which a driver failed to go out on his route, and the plaintiff provided a substitute, the driver was given no credit for the sales made. In addition to their other income, the plaintiff paid these drivers a bonus at the end of the selling season as an inducement to them to continue to sell its products after Labor Day. The plaintiff furnished and paid for peddlers' licenses for the drivers. The drivers employed container boys who were paid by the plaintiff $3 a week in addition to commissions on the sales they made. The plaintiff also provided and paid for liability and property damage insurance for all the trucks.

The trial court sustained the ruling of the administrator that these drivers were employees of the plaintiff within the Unemployment Compensation Law, General Statutes, 1937 Sup., Chapter 280a. Employment is defined in this law, 1937 Sup., § 803d, as follows: " 'Employment' shall mean any service, including service in interstate commerce, performed under any express or implied contract of hire creating the relationship of master and servant, whether such ser-

vice is performed in this state or elsewhere." "The independent contractor contracts to produce a given result by methods under his own control, while the employee contracts to produce a given result subject to the lawful orders and control of the employer in the means and methods used; these point in some degree to the duty of service to the employer." *Tortorici* v. *Moosop, Inc.,* 107 Conn. 143, 146, 139 Atl. 642; *Northwestern Mutual Life Ins. Co.* v. *Tone,* 125 Conn. 183, 190, 4 Atl. (2d) 640. The controlling consideration in the determination whether or not the relationship of master and servant exists, or that of independent contractor, is: "Has the employer the general authority to direct what shall be done and when and how it shall be done—the right of general control of the work." *Welz v. Manzillo,* 113 Conn. 674, 680, 155 Atl. 841; *Morganelli* v. *Derby,* 105 Conn. 545, 551, 135 Atl. 911; *Lassen* v. *Stamford Transit Co.,* 102 Conn. 76, 79, 128 Atl. 117; *Aisenberg* v. *Adams Co., Inc.,* 95 Conn. 419, 421, 111 Atl. 591; *Thompson* v. *Twiss,* 90 Conn. 444, 447, 97 Atl. 328. Under its agreement, the plaintiff had the right to take away the truck and route from the so-called "purchaser" at any time or any place. The retention of "the right of discharge is one of the strong indications that the relationship is one of employment. An independent contractor must be permitted to finish his contract in the absence of breach on his part." *Aisenberg* v. *Adams Co., Inc.,* 95 Conn. 419, 423, 111 Atl. 591. In addition, the "purchaser" agreed not to engage in that business for a period of two years in any part of the county in which the route lay, or solicit any customers on the list of customers furnished.

The relationship of master and servant may exist, although the drivers were not on the plaintiff's payroll; *Caraher* v. *Sears, Roebuck & Co.,* 124 Conn. 409,

414, 200 Atl. 324; or pay their own expenses; *Hall* v. *Sera,* 112 Conn. 291, 295, 152 Atl. 148; or although their compensation consisted of the difference between the price at which the products were sold and the price paid to the company. *Matter of Glielmi* v. *Netherland Dairy Co.,* 254 N. Y. 60, 171 N. E. 906. As stated by Judge Cardozo in the *Glielmi* case, p. 63, "The salesman has no discretion as to the manner of performance, or none that is substantial. He travels a prescribed route from which he may not deviate. If he fails to work it diligently, he knows that there will be an end of his employment as surely as if he were working for a stated wage. On the one side there is an intimacy of control and on the other a fullness of submission that imports the presence of a 'sovereign,' as the master, we are reminded, was sometimes called in the old books." "The contract is adroitly framed to suggest a different relation, but the difference is a semblance only, or so the triers of facts might find." *Matter of Glielmi* v. *Netherland Dairy Co.,* supra, 62. This language fits almost with precision the situation disclosed in the case at bar; and we conclude that the commissioner properly determined that the twenty-eight drivers were employees of the plaintiff within the purview and intent of General Statutes, 1937 Sup., Chapter 280a, and that the employer should be assessed unemployment compensation upon their behalf.

There is no error.

In this opinion the other judges concurred.