ANDREW S. OGOZALEK *v.* ADMINISTRATOR, UNEMPLOY-
MENT COMPENSATION ACT

SUPERIOR COURT       WINDHAM COUNTY       FILE No. 11311

Memorandum filed April 26, 1960

*Walter J. Ogozalek,* of Willimantic, for the plaintiff.

*Albert L. Coles,* attorney general, and *Harry Silverstone,* assistant attorney general, for the Administrator, Unemployment Compensation Act.

MACDONALD, J. This is an appeal under the provisions of § 31-270 of the General Statutes from the action of the defendant, as administrator of unemployment compensation, in assessing contributions totaling $394.84, including interest, as due from the plaintiff for the four quarters of 1956, the second, third and fourth quarters of 1957 and the four quarters of 1958. Neither amount nor method of computation is in dispute, and the sole question for determination is whether the persons upon whose earnings the assessments were predicated were employees of the plaintiff or of independent contractors.

The plaintiff, at all times relevant to this appeal, was, and is, in the business of selling ice cream at retail to the general public through the medium of refrigerated vending trucks operating out of the plaintiff's principal headquarters and place of business, located in Willimantic. The plaintiff owned

five such trucks, with his trade name "A. & W. Ice Cream," painted conspicuously on each truck and with a price list fixed by him, ranging on various items and quantities from five cents to $1.29, posted on each truck. The plaintiff repaired, serviced and maintained these trucks, obtained and paid for the insurance which covered them and paid for the gasoline and oil which ran them. All this the plaintiff was obligated to do under the terms of his agreements with the vendor-operators of the trucks, who are the controversial figures of this dispute. These agreements, one of which, in a form identical for our purposes with all, is in evidence as exhibit A, also required the plaintiff to pay all other truck expenses and the expenses of obtaining local licenses and to sell his products to the operators at 20 per cent below the regular retail prices of same. The agreement was terminable by either party immediately upon giving notice to the other party and took great care to spell out the relationship of independent contractor rather than that of servant or agent, containing the following express language: "The essence of this agreement is that said contractor [operator] is and shall be an independent contractor. The said Ogozalek [plaintiff] shall have no control over the routes taken by the contractor, the hours of work of the said contractor, and the methods used by said contractor. It is clearly understood that the said contractor is not the servant or agent of the said Ogozalek." As a matter of fact, such infinite care is shown in defining the relationship that one is inclined to wonder whether or not the language of the agreement, in the words of Shakespeare, ". . . doth protest too much, methinks." Hamlet, act III, scene 2.

In actual practice, the plaintiff obtained applicants by advertising for "Driver-Salesman; Ice Cream Products"; required each one engaged to

sign an agreement in the form of exhibit A; furnished each with a pair of white pants to wear while vending; paid for the laundering of same; and started each operator off on each working day with a full stock of ice cream products (and sometimes other of the plaintiff's products) and $25 in change. Although the agreement provided that each contractor "pay to the said Ogozalek for said merchandise when the said Ogozalek delivers same to such contractor," the common practice, especially in the case of the younger boys, was for the operator or "contractor" simply to sign a slip, taking out the merchandise "on credit," with the amount of his indebtedness thus incurred deducted from the profits of each week's operations—20 per cent of all the money brought in by each operator. In other words, for practical purposes, an operator had no expense whatsoever and received a 20 per cent commission on sales at the end of each working week.

The plaintiff did not assign each operator a certain route but did assign him to a specific territory and would tell him when he could "take over" another route when it was vacated. He did not supervise the location of sales efforts within an operator's territory but did "suggest" certain locations, such as a ball park, at certain times—"suggestions" which were generally followed. He did not specify certain working hours, but when a boy wanted to lay off because of poor weather, he was told by the plaintiff to go on out and try to sell. The plaintiff testified that he never terminated an operator's services because of unsatisfactory work, but that he had terminated because of an operator's drinking while on the job. Of course he had the power to terminate the relationship at any time under the agreement.

The facts of the instant case, as outlined above, are quite similar to those reviewed in *Jack & Jill,*

*Inc.* v. *Tone,* 126 Conn. 114 (1939), except for the fact that there an operator agreed not to engage in the business in question for two years after termination of his contract or to solicit customers on the list of customers furnished to him. That distinction is not sufficient to render inapplicable the language of our Supreme Court at page 119: "Under its agreement, the plaintiff had the right to take away the truck and route from the so-called 'purchaser' at any time or any place. The retention of 'the right of discharge is one of the strong indications that the relationship is one of employment. An independent contractor must be permitted to finish his contract in the absence of breach on his part.' "

Under § 31-222 (a) (1) of the General Statutes, the word "employment" is defined, for purposes of chapter 567, pertaining to unemployment compensation, as "any service . . . performed under any express or implied contract of hire creating the relationship of employer and employee." There is no doubt that there was a "service" here to plaintiff—whose entire business depended upon the sales made by these "driver-salesmen," and that it was performed pursuant to an express contract, exhibit A. The relationship of master and servant may exist although the operators were not specifically on plaintiff's pay roll; *Caraher* v. *Sears, Roebuck & Co.,* 124 Conn. 409, 414; or "although their compensation consisted of the difference between the price at which the products were sold and the price paid to the company." *Jack & Jill, Inc.* v. *Tone,* supra, 120. See also *Matter of Glielmi* v. *Netherland Dairy Co.,* 254 N.Y. 60, 62, where Judge Cardozo states, in language peculiarly applicable to the instant case: "The contract is adroitly framed to suggest a different relation, but the difference is a semblance only, or so the triers of the facts might find." In other words, to once again quote the immortal bard,

"a rose [b]y any other name would smell as sweet."
Romeo and Juliet, act II, scene 1.

The determination of the status of an individual
as an independent contractor or employee is often
difficult and, in the absence of controlling consider-
ations, is a question of fact. *Robert C. Buell & Co.*
v. *Danaher,* 127 Conn. 606, 610; *Francis* v. *Franklin
Cafeteria, Inc.,* 123 Conn. 320, 326. As repeatedly
pointed out by our Supreme Court, the function of
this court in these proceedings is not to determine
the issue according to its own view, if that differs
from the administrator's, but only to ascertain
whether the administrator's conclusion was unrea-
sonable, arbitrary or illegal. *Grady* v. *Katz,* 124
Conn. 525, 530; *Loglisci* v. *Liquor Control Commis-
sion,* 123 Conn. 31, 36; *Huntington Telephone Co.* v.
*Public Utilities Commission,* 118 Conn. 71, 80; *Brein*
v. *Connecticut Eclectic Examining Board,* 103 Conn.
65, 87. It happens that in this instance the view of
the court does not differ from that of the adminis-
trator, though that is not necessary to reach the re-
sult which follows.

To quote the closely applicable language of the
court in *Jack & Jill, Inc.* v. *Tone,* 6 Conn. Sup. 493,
498: "In the instant case, the administrator, not-
withstanding the forms of the agreement and the
use of certain terms connotative of different re-
lationships, might not unreasonably have concluded,
in the light of the circumstances surrounding the
parties when they executed the agreement and their
conduct in and incident to the performance of it,
that it contemplated nothing more than a contract of
employment under which the services to be rendered
should be compensated in the equivalent of what
might otherwise have been denominated commis-
sions, and hence, that the relationship of master and
servant within the meaning of the statute arose and
subsisted at the time liability for the contributions

in question occurred. As the question discussed is the only one raised or urged, it is concluded that the administrator's order is not unreasonable, arbitrary or illegal and must, hence, stand."

Judgment may enter dismissing the appeal from the action of the administrator.